# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**JUSTINA HOLLAND,**
      Register Number 73612-018
      FCI Marianna
      P.O. Box 7007
      Marianna, FL 32447
                *Plaintiff*,

**v.**

**UNITED STATES OF AMERICA,**
      SERVE:
      Federal Tort Claims Act Section
      Tort Branch, Civil Division
      U.S. Department of Justice
      950 Pennsylvania Ave. NW
      Washington, DC 20530-0001

      U.S. Attorney's Office
      Civil Process Clerk
      555 Fourth St. NW
      Washington, DC 20530

      U.S. Attorney General Garland
      U.S. Department of Justice
      950 Pennsylvania Ave. NW
      Washington, DC 20530-0001

 and

**BETH REESE, in her individual capacity,**
      Bureau of Prisons
      Central Office HQ
      320 First Street, NW
      Washington, DC  20534

                *Defendants*.

Civil Action No.

1

# COMPLAINT

## INTRODUCTION

1. In 2021, Justina Holland self-surrendered to the Federal Bureau of Prisons. She knew she would be subjected to serve her term of imprisonment. She did not imagine that during her sentence, she would be subjected to a violent and horrific sexual assault by an officer entrusted with her care.

2. Due to failures throughout the chain of command of the BOP, especially at the Office of Internal Affairs, sexual predators have been free to prey upon incarcerated women whose safety they were tasked to ensure.

3. The BOP leadership, including Ms. Reese, have been aware of the culture of sexual abuse throughout the agency and specifically at FMC Carswell—where people in their care had been reporting sexual abuse by officers for years—and yet did nothing to meaningfully respond or otherwise protect the people incarcerated there.

4. As a direct result of these failures, Ms. Holland was violently raped and subsequently retaliated against after reporting the rape.

5. She continues to suffer retaliation from BOP staff through today.

6. Ms. Holland now suffers from ongoing trauma because of the rape and retaliation, including chronic nightmares, anxiety, and depression. She remains in the custody of the BOP and fears continual assault by those responsible for her care.

7. Despite her continued fears, she has chosen to bring this action in her real name, as she believes it is not she who should be ashamed.

## JURISDICTION AND VENUE

8.  This action involves claims arising under United States and District of Columbia laws. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, 1346(b)(1), 1367, and 1343(a)(4),

9.  Venue is proper in this district under 28 U.S.C. § 1391 because acts or omissions giving rise to the claims occurred in this district, and under 28 U.S.C. § 1391(3) because the individual Defendant is subject to this Court's personal jurisdiction.

## PARTIES

10. The Plaintiff, Ms. Holland, was at all times relevant here incarcerated in BOP facilities, including FMC Carswell.

11. The Defendant United States of America is liable for the tortious acts of its employees in accordance with the Federal Tort Claims Act.

12. The BOP is a component of Defendant United States of America's Department of Justice. The BOP operates and is in possession and control of the Federal Medical Center Carswell.

13. FMC Carswell is a federal female medical correctional institution providing special medical and mental health needs.

14. Defendant Beth Reese is Chief of the Office of Internal Affairs for the BOP.

15. She has held that role since May 2018.

16. Her duty station is in the Central Office in Washington, DC.

17. As chief of the Office of Internal Affairs, Ms. Reese is responsible for overseeing and properly responding to allegations of staff misconduct.

18. She has responsibilities for ensuring that investigations conducted by her office move forward and are completed in a timely manner.

19. These responsibilities include, but are not limited to, training and policy development regarding the office's handling of sexual misconduct allegations, reviewing retaliation allegations and determining whether to have a local investigator or someone from the Central Office further review the matter, reviewing local allegations and referring it to the appropriate local OIG field office, and tracking and maintaining awareness of investigations handled by the OIG.[1]

20. While acting and failing to act as alleged herein, Defendants had complete custody and total control of Ms. Holland.

21. Ms. Holland was dependent upon Defendants for her personal security and necessities.

22. In performing the acts and omissions contained herein, Defendants acted under color of federal law, each acted maliciously, callously, intentionally, recklessly, with gross negligence, and with deliberate indifference to the rights and personal security of Plaintiff. Each of them knew or should have known that their conduct, attitudes, actions, and omissions were, and are, a threat to Plaintiff and to her constitutionally, statutorily, and common law protected rights.

---

[1] Transcript of Evidentiary Hr'g at 25, 28, 37, 59, 61, *Cal. Coal. for Women Prisoners v. United States of America Fed. Bureau of Prisons*, (2024) (No. CV 23-04155-YGR).

23. Despite this knowledge, Defendants failed to take steps to protect Plaintiff and to ensure her rights to safety from sexual assault.

**A LONG-STANDING HISTORY OF SEXUAL ABUSE AT FMC CARSWELL AND THROUGHOUT THE BOP**

24. Sexual abuse by correctional officers and other prison staff at BOP facilities in the United States has been documented for decades.

25. In 1999, Amnesty International published a report titled "*Not part of my sentence: Violations of the human rights of women in custody.*"

26. That Amnesty Report detailed:

> Many women in prisons and jails in the USA are victims of sexual abuse by staff, including sexually offensive language; male staff touching inmates' breasts and genitals when conducting searches; male staff watching inmates while they are naked; and rape.[2]

27. The Amnesty Report was widely circulated and read by responsible corrections professionals.

28. From 2014 to 2018, 35 women at the FMC Carswell reported sexual abuse from staff members.

---

[2] Amnesty International, *Not part of my sentence: Violations of the human rights of women in custody,* available at https://www.amnesty.org/en/documents/amr51/001/1999/en/.

29. This number was the highest rate of reported sexual abuse of any federal women's prison, until recent news about FCI Dublin, the federal prison infamously referred to as the "rape club."[3]

30. The Amnesty Report found that FMC Carswell "has been plagued with systemic sexual abuse for years," revealing hundreds of pages of incident reports, federal records, and court documents documenting a pattern of sexual misconduct and cover-ups.

31. The true number of assaults that occurred over this period at FMC Carswell is likely worse than records indicate because many prisoners don't report sexual assaults for fear of retaliation.

32. Since 1997, at least 12 correctional staff at FMC Carswell have been convicted of sexual abuse that occurred while at FMC Carswell.

33. Two lawsuits were filed by two women related to the 2021 repeated sexual assaults by recreation specialist Marerllis Nix, who was a known sexual predator.

34. FMC Carswell staff witnessed Nix take women to isolated areas of the prison, outside the view of cameras, but failed to intervene.[4]

---

[3] Kaley Johnson, *Fort Worth Carswell women's prison plagued by sexual abuse, cover ups,* Star-Telegram, Sept. 2, 2022, https://www.star-telegram.com/news/local/crime/article264613401.html.

[4] Megan Cardona, *Sexual abuse a 'severe problem' at Fort Worth's Carswell prison, attorneys for 2 women say*, KERA News, Mar. 11, 2024, https://www.keranews.org/criminal-justice/2024-03-11/fort-worth-carswell-sexual-abuse-federal-prison-2-victims.

35. In 2004, FMC Carswell officer Michael Lawrence Miller was found guilty of 5 counts of assault, abusive sexual contact with a ward, abusive sexual contact, sexual abuse of a ward, and aggravated sexual abuse.[5]

36. In 2008, an FMC Carswell chaplain was sentenced to four years in prison for sexually abusing women in his custody.[6]

37. One prisoner reported abuses that occurred in 2011, 2012, 2015, 2017, and 2018. These abuses included rape committed by two federal officers, who also beat her unconscious and attacked her with a burning liquid after she reported the rape.[7]

38. From 2012 to 2021, the BOP Office of Internal Affairs substantiated at least 16 cases of BOP staff sexually abusing women incarcerated at FMC Carswell, almost all before Officer Feeney raped Plaintiff.[8]

39. Still, Defendants Reese and United States took no meaningful action to address the culture, physical plant, or supervision at FMC Carswell.

---

[5] Michael Rigby, Sexual Predation Rampant at FMC-Carswell; Another Employee Convicted, Prison Legal News, May 15, 2007, https://www.prisonlegalnews.org/news/2007/may/15/sexual-predation-rampant-at-fmc-carswell-another-employee-convicted/.

[6] *Priest Who Sexually Abused Inmates at FMC Carswell in Fort Worth Sentenced to 4 Years in Federal Prison,* US DOJ OIG, May 5, 2008, https://oig.justice.gov/sites/default/files/2020-05/2008-05-05.pdf.

[7] Kaley Johnson, *Pakistani prisoner beaten and sexually assaulted in Fort Worth federal prison, lawsuit says*, KERA NEWS, Sept. 25, 2024, https://www.keranews.org/criminal-justice/2024-09-25/aafia-siddiqui-carswell-pakistani-prisoner-sexual-assault-fort-worth-federal-prison-lawsuit.

[8] *Sexual Abuse of Female Inmates in Federal Prison*, United States Senate, Dec. 13, 2022, https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/2022-12-13%20PSI%20Staff%20Report%20-%20Sexual%20Abuse%20of%20Female%20Inmates%20in%20Federal%20Prisons.pdf

40. In 2016, BOP employee Matthew McGaugh began sexually abusing an incarcerated woman under his custody. She reported him, but faced constant retaliation. He was convicted in 2017.[9]

41. In 2021, Lieutenant Luis Curiel sexually abused three women. He was reported in June or July 2021 by another staff member, yet was allowed to remain working at FMC Carswell, where he continued sexually assaulting prisoners. He pled guilty to two counts of sexual abuse and admitted in the criminal prosecution that he had sexually abused three women under his custody at FMC Carswell.[10]

42. William Walker, another correctional officer at FMC Carswell sexually abused at least one woman in his care. Rather than terminating him, the BOP moved Officer Walker to the position of Correctional Institution Administrator at a BOP facility in Texarkana.

43. A BOP staff member who worked at FMC Carswell described the prison as "the perfect place for sexual misconduct," but remained anonymous for fear of retaliation. This same officer had previously reported a lieutenant for exchanging drugs for sex, and was subsequently retaliated against and fired. [11]

---

[9] *Former BOP Employee Sentenced for Engaging in Sexual Acts with Inmate*, USAO Press Release, Nov. 7, 2017, https://www.justice.gov/usao-ndtx/pr/former-bop-employee-sentenced-engaging-sexual-acts-inmate.

[10] *See United States v. Luise Curiel*, 4-22-cr-00132 (N.D.T.X) 2022.

[11] *See*, supra, 4

44. In the PREA Audit Report at FMC Carswell conducted in the beginning of 2022, it was noted that in just the previous 12 months, 9 officers were referred for criminal prosecution for sexually assaulting a prisoner.[12]

45. This level of abuse should have been noted by Defendants as a crisis worthy of an all-hands-on-deck response.

46. It was not.

47. The unaddressed culture of sexual abuse at FMC Carswell directly led to Ms. Holland's abuse.

48. Sexual abuse by staff at BOP women's prisons has not been limited to FMC Carswell.

49. It occurs across BOP facilities across the country.

50. In 2007, five former corrections officers were convicted on criminal charges relating to the sexual abuse of female prisoners at FCI Tallahassee.

51. A 2021 lawsuit filed by four plaintiffs revealed sexual abuse by an FCI Tallahassee physician assistant.[13]

52. Before this action, the same physician assistant was named in at least four civil suits alleging sexual abuse.[14]

---

[12] Robert Palmquist, Prison Rape Elimination Act Audit Report, Apr. 6, 2022, https://www.bop.gov/locations/institutions/crw/crw_prea.pdf.

[13] Compl. at 1, *Batchelor et al v. Rolston et al*, No. 4:21-cv-00232-AW-MAF (N.D. Fla. June 4, 2021).

[14] *Id*.

53. In August 2021, a former corrections officer at FCI Tallahassee received a two-year prison sentence for the sexual abuse of a prisoner.[15]

54. The victim in this case also filed a civil lawsuit, which named a second FCI Tallahassee guard accused of abuse.

55. The civil case settled in 2022.[16]

56. In 2022, a different former corrections officer at FCI Tallahassee was sentenced to prison for four years for the sexual abuse of a prisoner while working at the facility.[17]

57. His indictment included charges related to multiple prisoners.

58. In July 2022, a DOJ working group was tasked to address "reported and proven sexual misconduct by Federal Bureau of Prisons ("BOP") employees" by reviewing the DOJ's approach to monitoring and deterring employee sexual misconduct.[18]

59. The working group noted long-standing, pervasive problems throughout the BOP.

---

[15] Press Release, United States Attorney's Office for the Northern District of Florida, Former Bureau of Prisons Correctional Officer Sentenced to 24 Months in Federal Prison For Sexually Abusing Inmates (Aug. 27, 2021), https://www.justice.gov/usao-ndfl/pr/former-bureau-prisons-correctional-officer-sentenced-24-months-federal-prison-sexually.

[16] Silja Talvia, *Women Report 'Rampant' Sexual Abuse at Federal Prison Where Ghislaine Maxwell is Held,* THE APPEAL, Apr. 25, 2023, https://theappeal.org/fci-tallahassee-sexual-abuse-women-prison-ghislaine-maxwell/.

[17] Christopher Cann, *Former Tallahassee correctional officer sentenced to 4 years in prison for sexually abusing inmate*, TALLAHASSEE DEMOCRAT, Mar. 11, 2022, https://www.tallahassee.com/story/news/2022/03/11/former-tallahassee-correctional-officer-sentenced-4-years-prison-for-abusing-inmate-leon-county/6984207001/.

[18] The Principal Associate Deputy Attorney General Working Group of DOJ Components, *Report and Recommendations Concerning the Department of Justice's Response to Sexual Misconduct by Employees of the Federal Bureau of Prisons*, Nov. 2, 2022, https://www.justice.gov/d9/pages/attachments/2022/11/03/2022.11.02_bop_sexual_misconduct_working_group_report.pdf.

60. The working group learned of long-standing insufficient reporting mechanisms, "flawed investigations," and examples of "inadequate administrative sanctions and initial prosecutorial declinations for employees ultimately convicted of egregious misconduct."[19]

61.  The working group found that "advocates and formerly incarcerated women identified several obstacles to reporting sexual abuse, including a fear of not being believed, a fear of retaliation, and a fear that reporting would not result in consequences for the perpetrator."

62. The working group found that "formerly incarcerated individuals reported that corrections officers have threatened retaliation against reporting individuals, including by restricting access to children."

63. One particular problem it found was that, until the early 2020s, "SIS officers were encouraged during initial intake interviews to obtain from victims sworn declarations in writing under penalty of perjury, presumably for a later administrative investigation."

64. This practice was a problem because "There is no legal requirement for sworn statements or affidavits, and the evidentiary value of these sworn affidavits may be limited. At the same time, requiring such sworn statements run counter to trauma-informed practices and may chill reporting, as it heightens a victim's fear that she may face prosecution if her account is not believed."

65. Finally, the working group noted the problems created by blind spots in many women's prisons and suggested that the "BOP should continue to upgrade camera technology and

---

[19] *Id.*

implementation and, beginning with female institutions, review and expand coverage of currently deployed cameras across BOP systems to eliminate 'blind spots.'" [20]

66. The working group also issued elementary guidance regarding establishing an appropriate tone about sexual misconduct at BOP facilities: "The Director of BOP should issue a message reiterating the gravity of sexual misconduct and expressing that sexual misconduct will not be tolerated." [21]

67. The implication of this guidance is that this message had not been communicated to BOP staff.

68. This implication has been bolstered by additional information.

69. An investigation by the Associated Press published in 2021 unfolded that over a hundred federal prison workers had been convicted or arrested for crimes since 2019, including a drug treatment specialist at Kentucky prison medical center who threatened prisoners' lives if they didn't comply with sexual abuse. [22]

70. The AP reporting also uncovered the Justice Department's failure to adhere to standard practice by not removing or suspending a prison official tasked with investigating staff misconduct, who was the subject of complaints and arrests himself. [23]

---

[20] *Id.*

[21] *Id.*

[22] Michael Balsamo, *Workers at federal prisons are committing some of the crimes*, TORONTO STAR, Nov. 14, 2021, https://www.thestar.com/news/world/united-states/workers-at-federal-prisons-are-committing-some-of-the-crimes/article_e52cd284-d095-5caa-8e5f-90173c580ffd.html.

[23] *Id.*

71. In October 2022, the DOJ Office of the Inspector General issued a report detailing its concerns over how the BOP had been handling of administrative misconduct investigations and prisoner statements relevant to those investigations. [24]

72. The OIG specifically noted that "The BOP's reluctance to rely on evidence provided by inmates enhances the likelihood that employees who have engaged in misconduct avoid accountability for their actions and remain on staff, thereby posing serious insider threat potential, including the risk of serious harm to inmates." [25]

73. The OIG further noted that the BOP's procedures had historically created a problem because "to the extent that the BOP's reluctance to rely on inmate testimony is known to its employees, this reluctance likely emboldens miscreant staff members in their interactions with inmates because such staff members may act without fear of disciplinary consequences." [26]

74. The report explained that the "OIG has serious concerns that that the BOP is reluctant to rely on inmate testimony in administrative misconduct investigations, has a general practice of avoiding calling inmates as witnesses in MSPB and arbitration proceedings, and, at least in matters involving staff on inmate sexual assault, is effectively requiring significantly more proof than necessary under the applicable preponderance of the

---

[24] Michael E. Horowitz, *Management Advisory Memorandum: Notification of Concerns Regarding the Federal Bureau of Prisons' (BOP) Treatment of Inmate Statements in Investigations of Alleged Misconduct by BOP Employees*, Oct. 2022, https://oig.justice.gov/sites/default/files/reports/23-001.pdf.

[25] *Id.*

[26] *Id.*

evidence standard to sustain misconduct and take disciplinary action against BOP employees." [27]

75. In sum "The OIG concluded that this manner of handling misconduct by BOP employees is contrary to federal regulations and BOP policy and creates significant risks for the BOP." [28]

76. Over the last two years, more history of sexual abuse in the BOP has come to light.

77. A 2023 indictment involved the sexual abuse of two prisoners from 2018 through 2019 at Federal Correctional Institution Aliceville, perpetrated by a federal correctional officer. [29]

78. In 2022, a jury convicted a former prison warden at another federal facility afflicted by allegations of abuse, FCI Dublin, of sexually abusing three prisoners from 2019 through 2021 and of making false statements to a government agency in the investigation of criminal acts. Separate from the warden's own sexually abusive behavior, four FCI Dublin correctional officers were charged with abusing prisoners during this warden's tenure. [30] FCI Dublin has regularly been referred to as "the rape club."

---

[27] *Id.*

[28] Michael E. Horowitz, *Management Advisory Memorandum: Notification of Concerns Regarding the Federal Bureau of Prisons' (BOP) Treatment of Inmate Statements in Investigations of Alleged Misconduct by BOP Employees*, Oct. 2022, https://oig.justice.gov/sites/default/files/reports/23-001.pdf.

[29] Press Release, U.S. Dept. of Justice, Office of the Inspector General, *BOP Correctional Officer Indicted for Sexual Abuse of Inmates*, Apr. 24, 2023, https://oig.justice.gov/news/press-release/bop-correctional-officer-indicted-sexual-abuse-inmates.

[30] *Press Release, Office of Public Affairs, U.S. Dept. of Justice, Former Federal Prison Warden Sentenced for Sexual Abuse of Three Female Inmates, Mar. 22, 2023,* https://www.justice.gov/opa/pr/former-federal-prison-warden-sentenced-sexual-abuse-three-female-inmates.

79. In 2024, a Special Master Report stemming from litigation surrounding sexual abuse at FCI Dublin unearthed a series of deficiencies at the California facility, some of which "are likely an indication of systemwide issues within the BOP, rather than simply within FCI-Dublin."[31]

80. Among the report's findings detailing the failures of the central BOP office including "the failure of Central Office and Regional Office management to correct significant and longstanding deficiencies that had previously been idenfied [sic] in multiple audits and investigations."[32]

81. The Special Master further found that "Furthermore, management's failure to ensure staff adhered to BOP policy put the health, safety and liberty of AICs [adults in custody] at great risk for many years."[33]

82. The Special Master noted that the BOP had understaffed and given low priority to Women and Special Populations Branch.[34]

83. The Special Master found that the "Female Offender Program Statement is outdated and does not reflect state-of-the-art knowledge on managing female AIC populations."[35]

---

[31] Wendy Still, *First Report of the Special Master Pursuant to the Court's Order of March 26, 2024*, June 5, 2024, https://static1.squarespace.com/static/64a5d4d138199b2c7c48c3de/t/66d361045918c670b861f4af/1725128967464/FCI+Dublin%2C+Special+Master+Report+%28No+Attachments%29.pdf.

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Id.*

84. The Special Master also reported that the BOP had "no standard protocol to report violations."[36]

85. The Special Master also found that the "BOP does not use PREA or other data to monitor reports of assault."[37]

86. In short, the long history of the Defendants' mismanagement created the conditions that led directly to Ms. Holland being raped by a BOP staff member.

## THE ASSAULT ON MS. HOLLAND AND THE AFTERMATH

87. In 2021, Ms. Holland entered the BOP and was held at FMC Carswell.

88. She was placed at FMC Carswell for medical reasons.

89. Prior to her self-surrendering in 2021, Ms. Holland suffered stroke-like symptoms following an accident at home and experienced partial paralysis on her right side.

90. As such, Ms. Holland was housed on Floor 4, or "Med Surge," one of the medical floors at FMC Carswell.

91. Despite her frequent requests, Ms. Holland received no physical therapy until August 2022, following a subsequent neurological incident.

92. As a result, Ms. Holland required assistance from others to move around.

93. She required a wheelchair until May 2023.

94. During this time, she required assistance to get around and she needed help in moving her wheelchair, getting in and out of her wheelchair, opening food, buttoning her pants, and even with brushing her hair.

---

[36] *Id.*

[37] *Id.*

95. Ms. Holland was wholly dependent on other people.

96. In February 2022, Officer Shane Feeney began working in Ms. Holland's unit.

97. He worked the 4pm-midnight shift until the quarter changed in October 2022.

98. Officer Feeney was friendly and would talk with Ms. Holland about her family, football, and church.

99. Ms. Holland ran a Bible study group.

100. Officer Feeny would join their bible study.

101. At first, Ms. Holland believed that Officer Feeney was a nice guy who wanted to treat the prisoners with kindness.

102. Things started to change in April 2022 when one day Officer Feeney entered Ms. Holland's room and showed her roommate a bottle of pills.

103. Ms. Holland knew that her roommate was selling drugs and, to her, Officer Feeney's actions indicated that Officer Feeney was supplying them to her roommate.

104. After this point, she started seeing him get friendlier with the prisoners.

105. He would come into women's rooms and sit on their bed, talking for hours; he would bring food and other contraband in; he would show the women images on the computers; and he would talk with Ms. Holland about women he was with sexually on the outside.

106. Ms. Holland started to feel like something was off and that Officer Feeney was interested in something in return for his kindness.

107. In July 2022, Ms. Holland suffered another neurological issue and her right hand entirely contracted in.

108. Following her trip to medical, when she was in the room by herself waiting for a nurse, Officer Feeney entered the room, shut the door, and sat next to Ms. Holland, holding her hand.

109. Nothing sexual happened, but Ms. Holland felt incredibly uncomfortable.

110. This discomfort was compounded by the rumors Ms. Holland had heard about disciplinary troubles Officer Feeney had at FMC Carswell, including bringing in contraband for prisoners and having inappropriate relationships with prisoners.

111. In addition, Officer Feeney had once confided in Ms. Holland that he had been written up for disciplinaries but that it was because he was being targeted for being too nice.

112. Despite the information that Officer Feeney was suspected of having inappropriate relationships with prisoners in his custody, Defendants let him keep working in close contact with prisoners.

113. Allowing this continued access to prisoners was contrary to written policy and sound corrections practice.

114. On information and belief, Officer Feeney was moved to Ms. Holland's floor, from the COVID unit, before the quarter's end on February because he had been caught bringing in drugs.

115. Despite this, contrary to policy and sound corrections practice, Defendants decided not to suspend Officer Feeney or conduct a more thorough investigation.

116. Instead, they just moved him to a different floor.

117. He therefore remained on the compound and continued to have unfettered access to FMC Carswell prisoners.

118.     In September 2022, Ms. Holland was getting ready to shower.

119.     The shower was located in the bathroom inside her cell.

120.     Because she could not move the right side of her body, showering required her to be sitting in a shower chair, and she needed assistance getting pushed into the shower.

121.     Ms. Holland's roommate assisted Ms. Holland by pushing her wheelchair into the shower and assisted her getting into the shower chair before leaving the bathroom.

122.     As Ms. Holland began showering, with the shower head in front of her, she heard the door to the bathroom opening, assuming that it was her roommate.

123.     But the shower curtain opened and Officer Feeney was standing there.

124.     Officer Feeney then grabbed Ms. Holland by her left arm, pulling her up, and letting her right side hang off him.

125.     She heard Officer Feeney unzipping his pants while he told her to keep her mouth shut.

126.     He then began to sodomize Ms. Holland while she screamed and cried for help.

127.     Ms. Holland is not sure how long the assault lasted.

128.     When Officer Feeney heard a noise, he got nervous, dropped Ms. Holland in the shower, and left.

129.     Ms. Holland laid on the floor in the shower, with bloody knuckles, crying hysterically.

130.     She was able to hook her left foot onto the wheelchair and army crawl to the wheelchair, where she pulled herself up and went to her room.

131. As she was getting ready to go to the prayer group, another prisoner stopped her outside the cell and told her she heard yelling.

132. Ms. Holland asked this prisoner not to tell anyone because she feared retaliation.

133. Ms. Holland was distraught, but thought that no one would believe her.

134. She kept this rape a secret April 20, 2023.

135. After the violent rape, Ms. Holland did not see Officer Feeney until he worked an overtime shift on her floor on April 19, 2023.

136. When she saw Officer Feeney again, she was triggered and the trauma of the rape came rushing back.

137. She called her husband at the time and was unable to keep the rape a secret any longer.

138. Her husband then called the prison to report the rape.

139. When Ms. Holland came forward, she was sent to the nurses' station for a rape kit.

140. While there, the nurse on duty told her that she had previously reported Officer Feeney to BOP officials for sexually harassing other prisoners, but that nothing had been done.

141. This nurse also said had witnessed a prisoner sitting on Officer Feeney's desk alone in his room and reported just that to BOP officials.

142. After Ms. Holland was taken to the nurses' station, she spoke with Lieutenant Frontera at FMC Carswell who conducted the initial interview.

143. At this time, a counselor told Ms. Holland that Officer Feeney was not going to be coming back to work at FMC Carswell.

144. The following week, an investigator with OIG came for a meeting to investigate the sexual assault.

145. The OIG Investigator told Ms. Holland that Officer Feeney had also been disciplined for bringing in drugs.

146. After Ms. Holland's meeting, OIG started calling other prisoners down to talk about Officer Feeney.

147. On information and belief, during these interviews, OIG told some prisoners them that Ms. Holland had told her that Officer Feeney was bringing in drugs.

148. As a result, Ms. Holland was threatened by prisoners and she requested protective custody the day after OIG began interviewing others because she feared for her life.

149. She requested protective custody again in November 2023 after she was moved to another unit with many women Officer Feeney had been supplying with drugs.

150. In August 2023, Ms. Holland finally received therapy by Anita McNew at the Women's Rape Crisis Center.

151. She received only six sessions.

152. The sessions were also not confidential because they were conducted in a room with two-way mirror where the staff lounge was on the other side of the mirror.

153. According to Ms. McNew, Ms. Holland presented with symptoms consistent with reported sexual trauma including anxiety, avoidance, concentration difficulties, crying, depression, difficulty not thinking about the trauma, difficulty trusting, eating problems, fatigue, fear, feeling emotionally numb, flashbacks, headaches, helplessness, intrusive

thoughts, loss of self-confidence, nightmares, shame, sleep difficulties, and stress. She was also diagnosed with PTSD.

154. Although Ms. Holland was moved to a new prison, BOP staff know that she reported the abuse, and she continues to face retaliation.

155. Ms. Holland had enough sentencing credits to have been eligible to be sent to a halfway house on September 24, 2024.

156. Even so, her halfway house application was not submitted until January 20, 2025.

157. Then, after she was given a halfway house date of March 3, 2025, someone pushed her date back to this summer.

158. A sympathetic staff member has tried to change her date back to April 23, 2025, but Ms. Holland has not heard if that has been approved yet.

159. Defendants' acts caused Plaintiff severe mental, physical, and emotional harm including PTSD, night terrors, depression, and chronic anxiety.

## EXHAUSTION

160. On February 28, 2024, Ms. Holland's administrative claim under the Federal Tort Claims Act was processed by the BOP's South Central Regional Office.

161. The BOP acknowledged receipt but has not substantively responded.

**CAUSES OF ACTION**

**COUNT I – NEGLIGENCE UNDER FEDERAL TORT CLAIMS ACT
(AGAINST DEFENDANT UNITED STATES OF AMERICA)**

162. Plaintiff repeats and incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth above.

163. At all relevant times, Defendant United States of America acted negligently in its indifference to Plaintiff's safety.

164. At all relevant times, Defendant United States of America hired correctional and administrative employees at FMC Carswell, including Officer Feeney, as well as colleagues and supervisors of Officer Feeney whose identity are currently unknown to Plaintiff.

165. At all relevant times, Defendant United States of America's employees were acting within the scope of their employment, in their official uniforms during work hours, as federal employees of Defendant.

166. At all relevant times, FMC Carswell personnel held themselves out to incarcerated individuals as personnel with the ability and knowledge to carry out their duties, provide due care, and to act in accordance with standards of reasonable care.

167. At all relevant times and within the scope of their employment by Defendant United States of America, the above-named and unknown staff, while working within their official capacities at FMC Carswell, owed a duty to Plaintiff while she was at FMC Carswell.

168. In addition to a custodial duty owed to Plaintiff, Defendant United States of America was statutorily obligated under the Prison Rape Elimination Act and BOP policy

to protect prisoners from foreseeable harm that included the sexual abuse suffered by Ms. Holland.

169.    Defendant United States of America should have known that Officer Feeney had a propensity to sexually abuse inmates, due to his past disciplinaries received at FMC Carswell.

170.    Defendant United States of America should have known that Officer Feeney acted inappropriately with prisoners under his care at FMC Carswell.

171.    Defendant United States of America was on notice of the possibility that prisoners would be sexually abused by corrections officers and other facility staff, through above-mentioned investigations, articles, lawsuits, and reports.

172.    As such, there was a foreseeable risk that correctional officers would sexually abuse Plaintiff and others under their control.

173.    Defendant did not exercise reasonable care in preventing Plaintiff and other prisoners from the foreseeable risk of sexual abuse.

174.    Defendant United States of America failed to create and implement procedures, training, and supervision that would protect prisoners from the foreseeable risk of harm, including sexual abuse.

175.    Defendant United States of America failed to adequately monitor and supervise employees, such as Officer Feeney, while employees were acting within the scope of their employment.

176.     Defendant United States of America knew or should have known of the risk posed to Plaintiff and other prisoners that they would be sexually assaulted by employees such as Officer Feeney.

177.     Defendant United States of America failed to maintain its facilities in a manner to deter the possibility of sexual abuse, including the above-mentioned lack of video cameras and the availability of unmonitored and isolated spaces in the facility.

178.     Due to Defendant United States of America's herein described acts and omissions, it breached its duty to protect Plaintiff and other prisoners from the reasonably foreseeable harm of sexual abuse by its employees.

179.     Defendant United States of America's above-described acts and omissions were a direct and proximate cause of Plaintiff's injuries and damages herein.

## COUNT II – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS CLAIM UNDER FEDERAL TORT CLAIMS ACT
### (AGAINST DEFENDANT UNITED STATES OF AMERICA)

180.     Plaintiff repeats and incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth above.

181.     As described above, Defendant United States of America directly caused or disregarded a substantial probability of causing severe emotional distress to Plaintiff.

182.     Defendant United States of America was negligent in its oversight and administration of FMC Carswell, which was a direct and proximate cause of Plaintiff's injuries.

25

183.     The acts and omissions of Defendant United States of America, described above, physically endangered Plaintiff and caused her injury through the sexual abuse she suffered. These acts and omissions constitute the tort of negligent infliction of emotional distress under the laws of the District of Columbia.

## COUNT III – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM UNDER FEDERAL TORT CLAIMS ACT
### (AGAINST DEFENDANT UNITED STATES OF AMERICA)

184.     Plaintiff repeats and incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth above.

185.     Defendant United States of America's acts and omissions herein constituted extreme and outrageous conduct, which caused Ms. Holland's severe emotional distress following her sexual abuse.

186.     Defendant United States of America intended to cause, or were recklessly indifferent to the probability of causing, Plaintiff severe emotional distress.

187.     Officer Feeney engaged in extreme and outrageous conduct through violently raping Ms. Holland while she was incarcerated. He intended to cause her severe emotional distress, or was recklessly indifferent to the probability of causing such distress, when he sexually abused her while he was supposed to be providing medical care.

188.     At all relevant times, Officer Feeney was acting within the scope of his employment at FMC Carswell, and used his authority as a member of the facility's medical staff to sexually assault Plaintiff, while Plaintiff did not have the ability to consent or withhold consent.

189.    Defendant United States of America is liable for the intentional torts committed by Officer Feeney, and his abuse of his position of authority as a correctional officer within the scope of his employment.

190.    Defendant United States of America's acts and omissions were a direct and proximate cause of Plaintiff's serious physical and emotional harm.

## COUNT IV – SEXUAL BATTERY UNDER FEDERAL TORT CLAIMS ACT (AGAINST DEFENDANT UNITED STATES OF AMERICA)

191.    Plaintiff repeats and incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth above.

192.    Officer Feeney committed sexual battery on Ms. Holland. It was impossible for Ms. Holland to provide consent under 18 U.S.C. § 2243(b), which constitutes a felony when a BOP employee knowingly engages "in a sexual act with another person who is 1) in official detention; and (2) under the custodial, supervisory, or disciplinary authority of the person so engaging."

193.    Officer Feeney acted within the scope of his authority and employment as a federal employee in the medical unit at FMC Carswell.

194.    Ms. Holland reasonably believed that Officer Feeney was in a position of control or authority, and she did not have the ability to consent or not consent to sexual acts that he initiated.

195.    With the intent to cause harmful or offensive contact, Officer Feeney subjected Ms. Holland to sexual acts to which she could not consent. These acts were deeply offensive to her personal dignity and would offend a person of ordinary sensitivity.

196. These above-described acts and omissions were a direct and proximate cause of Plaintiff's serious physical and emotional harm.

197. Defendant United States of America is liable for the intentional torts committed by Officer Feeney, and his abuse of his position of authority as a correctional officer within the scope of his employment.

## COUNT V – SEXUAL ASSAULT UNDER FEDERAL TORT CLAIMS ACT
### (AGAINST DEFENDANT UNITED STATES OF AMERICA)

198. Plaintiff repeats and incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth above.

199. Plaintiff brings this Claim under the FTCA for sexual assault against Defendant United States of America, based on the conduct of its officers including Officer Feeney.

200. Officer Feeney subjected Ms. Holland to sexual acts with the intent to cause harmful or offensive contact. His intentional torts caused Ms. Holland's physical and emotional injuries, and Defendant United States of America is liable for intentional torts perpetrated by its agents within the scope of their employment.

201. It was impossible for Ms. Holland to provide consent under 18 U.S.C. § 2243(b), which constitutes a felony when a BOP employee knowingly engages "in a sexual act with another person who is 1) in official detention; and (2) under the custodial, supervisory, or disciplinary authority of the person so engaging."

202. Officer Feeney acted within the scope of his authority and employment as a federal employee in the medical unit at FMC Carswell.

203.    Ms. Holland reasonably believed that Officer Feeney was in a position of control or authority, and that she did not have the ability to consent or not consent to sexual acts that he initiated.

204.    The above-described acts and omissions were a direct and proximate cause of Plaintiff's serious physical and emotional harm.

205.    Defendant United States of America is liable for the intentional torts committed by Officer Feeney, and his abuse of his position of authority as a correctional officer within the scope of his employment.

## COUNT IX – NEGLIGENT SUPERVISION UNDER FEDERAL TORT CLAIMS ACT (AGAINST DEFENDANT UNITED STATES OF AMERICA)

206.    Plaintiff repeats and incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth above.

207.    Defendant United States of America hired Officer Feeney and other abusive employees, and allowed them to use their positions of power within the facility to exert influence over prisoners such as Ms. Holland.

208.    Defendant United States of America knew that potential abusers such as Officer Feeney would have the opportunity to be alone with female prisoners, particularly in secluded areas and areas without other facility personnel or video surveillance.

209.    Defendant United States of America failed to properly oversee and administer FMC Carswell, and failed to properly implement BOP and PREA policies that would have deterred sexual abuse such as that suffered by Ms. Holland.

210.     Defendant United States of America had knowledge of the threat of future sexual abuse posed to prisoners as committed by facility staff, through the above-mentioned reports and lawsuits.

211.     Defendant United States of America's knowledge of prior sexual abuse at FMC Carswell placed it on notice of employees' propensity to engage in sexually abusive behavior with prisoners such as Ms. Holland.

212.     If Defendant United States of America had properly supervised employees, facility staff such as Officer Feeney would not have been able to sexually abuse prisoners.

213.     If Defendant United States of America had conducted thorough investigations of reported employees, Officer Feeney would not have been able to continue sexually abusing prisoners, including Ms. Holland.

214.     Defendant United States of America was also negligent in allowing employees it knew previously committed sexual abuse to continue to safeguard and monitor a female population of prisoners.

215.     If Defendant United States of America had properly supervised and investigated employees such as Officer Feeney and his supervisors, it would have learned of his propensity to commit sexual abuse.

216.     Defendant United States of America's above-described acts and omissions were a direct and proximate cause of Plaintiff's serious physical and emotional harm.

**COUNT X - Trafficking Victims Protection Reauthorization Act ("TVPRA"),
18 U.S.C. § 1581, *et seq.*
(AGAINST DEFENDANT REESE)**

217.    Plaintiff repeats and incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth above.

218.    Congress passed the Trafficking Victims Protection Act and subsequent reauthorization acts ("TVPRA") to combat domestic human trafficking.

219.    The TVPRA allows for civil liability as set forth in 18 U.S.C. § 1595(a):

An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys' fees.

220.    A commercial sex act is "any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3).

221.    Officer Feeney made Plaintiff engage in sex acts through force and coercion.

222.    Defendant Reese, as Chief of the Office of Internal Affairs, knew or should have known that Officer Feeney had engaged in commercial sex acts with the Plaintiff in violation of the TVPRA, and had a duty to protect prisoners in their case such as Ms. Holland from reasonably foreseeable predators such as Officer Feeney.

223.    By her acts and omissions in failing to meet these duties, Defendant Reese benefitted through continued employment.

224.    Defendant Reese participated in a venture and facilitated the harboring and transportation of Plaintiff for purposes of sex induced by force, fraud, or coercion.

225.    Defendant Reese benefitted financially through continuing employment and advancement when she, through her own actions and those she directed in her office, ignored the conditions that led to Officer Feeney's abuse, and otherwise benefitted from facilitating this behavior that kept him in his role on the facility's medical staff.

226.    This conduct has caused Plaintiff serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm and she has a claim for damages for such violations under 18 U.S.C. § 1591, 18 U.S.C. § 1595.

**PRAYER FOR RELIEF**

Ms. Holland prays for judgment against Defendants, and each of them, as follows:

227.    An award of compensatory, punitive, and nominal damages to each named Plaintiff in an amount to be determined at trial;

228.    An award to Plaintiff of the costs of this suit and reasonable attorneys' fees and litigation expenses; and

229.    For such other and further relief as this Court may deem just and proper.

Respectfully submitted by,


*/s/ Deborah M. Golden*
Deborah M. Golden
DC Bar # 470-578

bex kolins
*DC Bar application Pending*
NC Bar # 58491

The Law Office of Deborah M. Golden
700 Pennsylvania Ave. SE, 2nd Floor
Washington, DC 20003
202-630-0332
dgolden@debgoldenlaw.com