# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | |
|---|---|
| JUSTINA HOLLAND,<br><br>*Plaintiff,*<br><br>v.<br><br>UNITED STATES OF AMERICA;<br>SHANE FEENEY, MICHAEL CARR, and<br>MICHAEL SMITH in their individual<br>capacities;<br><br>*Defendants.* | Civil Action No. 4:25-cv-00855-O |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

1. In 2021, Justina Holland self-surrendered to the Federal Bureau of Prisons. She knew she would be subjected to serve her term of imprisonment. She did not imagine, however, that during her sentence, she would be subjected to a violent and horrific sexual assault by an officer entrusted with her care.

2. Due to failures throughout the chain of command of the BOP, especially at the Office of Internal Affairs, sexual predators, especially those with a known history of sexually abusing women under their care, like Defendant Shane Feeney, have been free to prey upon incarcerated women whose safety they were tasked to ensure.

3. The BOP leadership has been aware of the culture of sexual abuse throughout the agency and specifically at FMC Carswell—where people in their care had been reporting sexual abuse by officers for years—and yet did nothing to meaningfully respond or otherwise protect the people incarcerated there.

1

4.  As a direct result of these failures, Defendant Feeney violently raped Ms. Holland and subsequently retaliated against her after reporting the rape.

5.  She continues to suffer retaliation from BOP staff today.

6.  Ms. Holland now suffers from ongoing trauma because of the rape and retaliation, including chronic nightmares, anxiety, and depression. She was recently released from BOP custody but remains under supervised release and fears continual retaliation.

7.  Despite her continued fears, she has chosen to bring this action in her real name, as she believes it is not she who should be ashamed.

**JURISDICTION AND VENUE**

8.  This action involves claims arising under United States and Texas laws. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, 1346(b)(1), 1367, and 1343(a)(4).

9.  Venue is proper in this district under 28 U.S.C. § 1391 because acts or omissions giving rise to the claims occurred in this district, and under 28 U.S.C. § 1391(3) because the individual Defendant is subject to this Court's personal jurisdiction.

**PARTIES**

10.  Plaintiff, Ms. Holland, was at all times relevant here incarcerated in BOP facilities, including FMC Carswell. She was recently released from BOP custody but remains on supervised release in Florida.

11.  Defendant United States of America Federal Bureau of Prisons ("BOP") is a governmental entity that operates and is in possession and control of the Federal Medical

2

Center Carswell ("FMC Carswell"). Defendant United States is liable for the tortious acts of its employees in accordance with the Federal Tort Claims Act.

12. FMC Carswell is a federal female medical correctional institution providing special medical and mental health needs.

13. Defendant Shane Feeney was a Correctional Officer at FMC Carswell at all times relevant to this action. He is sued in his individual capacity.

14. Defendant Warden Michael Carr was the warden of FMC Carswell up until May 2022, during the time a reasonable warden should have terminated, suspended, and/or otherwise reprimanded Defendant Feeney for violating BOP policy and endangering prisoners in his custody. He is sued in his individual capacity.

15. Defendant Warden Michael Smith was the warden of FMC Carswell beginning in May 2022, leading up to the time Defendant Feeney raped Ms. Holland. He is sued in his individual capacity.

16. While acting and failing to act as alleged herein, Defendants had complete custody and total control of Ms. Holland.

17. Ms. Holland was dependent upon Defendants for her personal security and necessities.

18. In performing the acts and omissions contained herein, Defendants acted under color of federal law, each acted maliciously, callously, intentionally, recklessly, with gross negligence, and with deliberate indifference to the rights and personal security of Plaintiff. Each of them knew or should have known that their conduct, attitudes, actions, and omissions were, and are, a threat to Plaintiff and to her constitutionally, statutory, and common law protected rights.

19. Despite this knowledge, Defendants failed to take steps to protect Plaintiff and to ensure her rights to safety from sexual assault.

## A LONG-STANDING HISTORY OF SEXUAL ABUSE AT FMC CARSWELL AND THROUGHOUT THE BOP

20. Sexual abuse by correctional officers and other prison staff at BOP facilities in the United States has been documented for decades.

21. This documentation was known to the Defendants.

22. Most recently, the Department of Justice's (DOJ) own internal investigations, following the revelation of rampant abuse at FCI Dublin, identified that nearly two-thirds of BOP facilities have documented sexual abuse allegations, including FMC Carswell.[1]

23. None of this documentation, however, is new.

24. In 1999, Amnesty International published a report titled "*Not part of my sentence: Violations of the human rights of women in custody*."

25. That Amnesty Report detailed:

> Many women in prisons and jails in the USA are victims of sexual abuse by staff, including sexually offensive language; male staff touching inmates' breasts and genitals when conducting searches; male staff watching inmates while they are naked; and rape.[2]

---

[1] U.S. Senate Permanent Subcommittee on Investigations, "Sexual Abuse of Female Inmates in Federal Prisons" (Dec. 13, 2022), https://www.ossoff.senate.gov/wp-content/uploads/2022/12/PSI-Embargoed-Staff-Report-re-Sexual-Abuse-of-Female-Inmates-in-Federal-Prisons.pdf at 88.

[2] Amnesty International, *Not part of my sentence: Violations of the human rights of women in custody,* available at https://www.amnesty.org/en/documents/amr51/001/1999/en/.

26. The Amnesty Report was widely circulated and read by responsible corrections professionals.

27. FMC Carswell is the only federal BOP medical and psychiatric facility in the country for women. It houses people requiring more intensive medical care, people with mental and physical disabilities, and people who are unable to take care of their own medical needs, a population especially vulnerable to sexual abuse. Given the vulnerability of people with intensive medical needs, Defendants should have taken extra care to ensure the protection of those within FMC Carswell.

28. Since 1997, at least 12 correctional staff at FMC Carswell have been convicted of sexual abuse that occurred while at FMC Carswell.

29. Two lawsuits were filed by two women related to the 2021 repeated sexual assaults by recreation specialist Marerllis Nix, who was a known sexual predator.

30. FMC Carswell staff witnessed Nix take women to isolated areas of the prison, outside the view of cameras, but failed to intervene.[3]

31. Nix was convicted by a jury on both counts of sexual abuse of a ward.[4]

32. In 2004, FMC Carswell officer Michael Lawrence Miller was found guilty of five counts of assault, abusive sexual contact with a ward, abusive sexual contact, sexual abuse of a ward, and aggravated sexual abuse.[5]

---

[3] Megan Cardona, *Sexual abuse a 'severe problem' at Fort Worth's Carswell prison, attorneys for 2 women say*, KERA News, Mar. 11, 2024, https://www.keranews.org/criminal-justice/2024-03-11/fort-worth-carswell-sexual-abuse-federal-prison-2-victims.

[4] *USA v. Nix*, Docket No. 4:25-cr-00116 (N.D. Tex. May 14, 2025).

[5] Michael Rigby, Sexual Predation Rampant at FMC-Carswell; Another Employee Convicted, Prison Legal News, May 15, 2007, https://www.prisonlegalnews.org/news/2007/may/15/sexual-predation-rampant-at-fmc-carswell-another-employee-convicted/.

33. In 2008, an FMC Carswell chaplain was sentenced to four years in prison for sexually abusing women in his custody.[6]

34. One prisoner reported abuses that occurred in 2011, 2012, 2015, 2017, and 2018. These abuses included rape committed by two federal officers, who also beat her unconscious and attacked her with a burning liquid after she reported the rape.[7]

35. From 2012 to 2021, the BOP Office of Internal Affairs substantiated at least 16 cases of BOP staff sexually abusing women incarcerated at FMC Carswell, almost all before Defendant Feeney raped Plaintiff.[8]

36. In 2016, BOP employee Matthew McGaugh began sexually abusing an incarcerated woman under his custody. She reported him, but faced constant retaliation. He was convicted in 2017.[9]

37. In 2021, Lieutenant Luis Curiel sexually abused three women. He was reported in July 2021 by another staff member, yet was allowed to remain working at FMC Carswell, where he continued sexually assaulting prisoners. He pled guilty to two counts of sexual abuse and admitted in the criminal prosecution that he had sexually abused three women

---

[6] *Priest Who Sexually Abused Inmates at FMC Carswell in Fort Worth Sentenced to 4 Years in Federal Prison,* US DOJ OIG, May 5, 2008, https://oig.justice.gov/sites/default/files/2020-05/2008-05-05.pdf.

[7] Kaley Johnson, *Pakistani prisoner beaten and sexually assaulted in Fort Worth federal prison, lawsuit says*, KERA NEWS, Sept. 25, 2024, https://www.keranews.org/criminal-justice/2024-09-25/aafia-siddiqui-carswell-pakistani-prisoner-sexual-assault-fort-worth-federal-prison-lawsuit.

[8] *Sexual Abuse of Female Inmates in Federal Prison*, United States Senate, Dec. 13, 2022, https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/2022-12-13%20PSI%20Staff%20Report%20-%20Sexual%20Abuse%20of%20Female%20Inmates%20in%20Federal%20Prisons.pdf.

[9] *Former BOP Employee Sentenced for Engaging in Sexual Acts with Inmate*, USAO Press Release, Nov. 7, 2017, https://www.justice.gov/usao-ndtx/pr/former-bop-employee-sentenced-engaging-sexual-acts-inmate.

under his custody at FMC Carswell. As a lieutenant, he supervised other officers, thereby demonstrating that this behavior was not only acceptable, but was permitted by Defendants.[10]

38. The staff member who reported Lt. Curiel was retaliated against and terminated. An administrative law judge found the termination to be unlawful because she engaged in protected whistleblowing activity by reporting the interaction she witnessed between Curiel and a prisoner.[11]

39. A BOP staff member who worked at FMC Carswell described the prison as "the perfect place for sexual misconduct," but remained anonymous for fear of retaliation. This same officer had previously reported a lieutenant for exchanging drugs for sex and was subsequently retaliated against and fired.[12]

40. The officer reported that, in retaliation for her reports of misconduct, a lieutenant intentionally tried to rile up women in her unit to cause them to fight her; another time, a group of senior officers cornered her in the parking lot after work and threatened her. Other officers told her she would lose her job for reporting misconduct, which she interpreted to mean that everyone knew to stay silent if they wanted to keep their jobs.[13]

41. Prisoners who reported the sexual assault that they experienced at FMC Carswell also reported retaliation, including the prison taking away access to family visits, ransacking

---

[10] *See United States v. Luis Curiel*, 4:22-cr-00132 (N.D. Tex.) 2022.

[11] *See Kaswatuka v. Dep't of Just.*, No. DA-1221-22-0301-W-1, Initial Decision (MSPB, Atlanta Reg'l Off. Jan. 10, 2024), *available at* https://www.tullylegal.com/wp-content/uploads/06_Kaswatuka_v_BOP-TO-BE-POSTED.pdf

[12] Kaley Johnson, *Exclusive: Fort Worth Carswell women's prison plagued by sexual abuse, cover ups,* FORT WORTH STAR-TELEGRAM, Sept. 2, 2022, https://www.star-telegram.com/news/local/crime/article264613401.html.

[13] *Id.*

their property, waking them up, verbally threatening and abusing them, and placing them in solitary confinement.[14]

42. In the PREA (Prison Rape Elimination Act) Audit Report at FMC Carswell conducted at the beginning of 2022, it was noted that in just the previous 12 months, 9 officers were referred for criminal prosecution for sexually assaulting a prisoner.[15]

43. From 2014 to 2018, 35 women at FMC Carswell reported sexual abuse from staff members. This number was the highest rate of reported sexual abuse of any federal women's prison, until recent news about FCI Dublin.[16]

44. The true number of assaults that occurred over this period at FMC Carswell is likely worse than records indicate because many prisoners don't report sexual assaults for fear of retaliation.

45. Undersigned counsel alone represents fourteen women who reported sexual abuse at FMC Carswell, who are not represented in the number above.

46. Likewise, upon information and belief, a paramedic working at FMC Carswell was removed from his position as recently as October 2025 after being reported for sexually assaulting at least three women.

47. Despite the audits, lawsuits, and criminal referrals, the abuse has continued, and Defendants failed to take appropriate action to prevent future abuse, such as that

---

[14] *Id.; see also Doe v. United States et al.*, Compl., ECF 1, ¶¶ 101-17, 4:24-cv-209-P (N.D. Tex. Mar. 6, 2024).

[15] Robert Palmquist, Prison Rape Elimination Act Audit Report, Apr. 6, 2022, https://www.bop.gov/locations/institutions/crw/crw_prea.pdf.

[16] The widespread sexual abuse at Dublin is documented in *California Coalition for Women Prisoners, et al. v. United States*, Case No. 4:23-cv-415%-YGR (N.D. Cal.).

experienced by Plaintiff, and continued to allow male staff to spend a significant amount of time alone and unsupervised with incarcerated women at FMC Carswell.

48. The culture of sexual abuse whereby Defendants failed to investigate allegations of sexual abuse; document, track, investigate, or reprimand known sexual predators; or otherwise monitor and protect prisoners at FMC Carswell—and across BOP facilities—directly led to Plaintiff's abuse.

## DEFENDANTS KNEW OF, AND FAILED TO PROPERLY ADDRESS, SEXUAL VIOLENCE RAMPANT ACROSS THE BOP

49. However, sexual abuse by staff at BOP women's prisons has not been limited to FMC Carswell.

50. It occurs across BOP facilities throughout the country.

51. Despite the knowledge that correctional staff sexually abuse prisoners in their custody, Defendants continue failing to take appropriate steps to protect those in their custody.

52. In 2007, five former corrections officers were convicted on criminal charges relating to the sexual abuse of female prisoners at FCI Tallahassee.

53. A 2021 lawsuit filed by four plaintiffs revealed sexual abuse by an FCI Tallahassee physician assistant.[17] Before this action, the same physician assistant was named in at least four civil suits alleging sexual abuse.[18] Another former officer at FCI Tallahassee received a two-year prison sentence for the sexual abuse of a prisoner.[19] The victim in

---

[17] *Batchelor et al v. Rolston et al*, Compl. at 1, No. 4:21-cv-00232-AW-MAF (N.D. Fla. June 4, 2021).

[18] *Id*.

[19] Press Release, United States Attorney's Office for the Northern District of Florida, Former Bureau of Prisons Correctional Officer Sentenced to 24 Months in Federal Prison For Sexually Abusing Inmates (Aug. 27, 2021), https://www.justice.gov/usao-ndfl/pr/former-bureau-prisons-correctional-officer-sentenced-24-months-federal-prison-sexually.

this case also filed a civil lawsuit, which named a second FCI Tallahassee guard accused of abuse, which settled in 2022.[20]

54. An investigation published by the Associated Press (AP) in 2021 documented that over a hundred federal prison workers had been convicted or arrested for crimes since 2019, including a drug treatment specialist at a Kentucky prison medical center who threatened prisoners' lives if they didn't comply with sexual abuse.[21]

55. The AP reporting also uncovered the Justice Department's failure to adhere to standard practice by not removing or suspending a prison official tasked with investigating staff misconduct, who was the subject of complaints and arrests himself. [22]

56. In 2022, a different former corrections officer at FCI Tallahassee was sentenced to prison for four years for the sexual abuse of a prisoner while working at the facility. His indictment included charges related to multiple prisoners.[23]

57. In July 2022, a DOJ working group was tasked to address "reported and proven sexual misconduct by Federal Bureau of Prisons ("BOP") employees" by reviewing the DOJ's approach to monitoring and deterring employee sexual misconduct by looking at the

---

[20] Silja Talvia, *Women Report 'Rampant' Sexual Abuse at Federal Prison Where Ghislaine Maxwell is Held,* THE APPEAL, Apr. 25, 2023, https://theappeal.org/fci-tallahassee-sexual-abuse-women-prison-ghislaine-maxwell/.

[21] Michael Balsamo, *Workers at federal prisons are committing some of the crimes*, TORONTO STAR, Nov. 14, 2021, https://www.thestar.com/news/world/united-states/workers-at-federal-prisons-are-committing-some-of-the-crimes/article_e52cd284-d095-5caa-8e5f-90173c580ffd.html.

[22] *Id.*

[23] Christopher Cann, *Former Tallahassee correctional officer sentenced to 4 years in prison for sexually abusing inmate*, TALLAHASSEE DEMOCRAT, Mar. 11, 2022, https://www.tallahassee.com/story/news/2022/03/11/former-tallahassee-correctional-officer-sentenced-4-years-prison-for-abusing-inmate-leon-county/6984207001/.

"hundreds of [incidents of] sexual abuse perpetrated by its employees over the previous five years."[24]

58. The working group noted long-standing, pervasive problems throughout the BOP that needed fixing. This working group learned of long-standing insufficient reporting mechanisms, "flawed investigations," and examples of "inadequate administrative sanctions and initial prosecutorial declinations for employees ultimately convicted of egregious misconduct."[25]

59. Additionally, it determined that there needed to be changes to the "culture and environment in BOP facilities" to address the rampant sexual violence.[26]

60. The working group found that "advocates and formerly incarcerated women identified several obstacles to reporting sexual abuse, including a fear of not being believed, a fear of retaliation, and a fear that reporting would not result in consequences for the perpetrator."

61. The working group found that "formerly incarcerated individuals reported that corrections officers have threatened retaliation against reporting individuals, including by restricting access to children."

62. One particular problem it found was that, until the early 2020s, "SIS officers were encouraged during initial intake interviews to obtain from victims sworn declarations in writing under penalty of perjury, presumably for a later administrative investigation."

---

[24] The Principal Associate Deputy Attorney General Working Group of DOJ Components, *Report and Recommendations Concerning the Department of Justice's Response to Sexual Misconduct by Employees of the Federal Bureau of Prisons*, Nov. 2, 2022, https://www.justice.gov/d9/pages/attachments/2022/11/03/2022.11.02_bop_sexual_misconduct_working_group_report.pdf (Working Gp. Rep.).

[25] *Id*.

[26] *Id*.

11

63.    This practice was a problem because "[t]here is no legal requirement for sworn statements or affidavits, and the evidentiary value of these sworn affidavits may be limited. At the same time, requiring such sworn statements runs counter to trauma-informed practices and may chill reporting, as it heightens a victim's fear that she may face prosecution if her account is not believed."

64.    Finally, the working group noted the problems created by blind spots in many women's prisons and suggested that the "BOP should continue to upgrade camera technology and implementation and, beginning with female institutions, review and expand coverage of currently deployed cameras across BOP systems to eliminate 'blind spots.'"[27]

65.    The working group also issued elementary guidance regarding establishing an appropriate tone about sexual misconduct at BOP facilities: "The Director of BOP should issue a message reiterating the gravity of sexual misconduct and expressing that sexual misconduct will not be tolerated."[28]

66.    The implication of this guidance, given the ongoing and rampant abuse within BOP, is that this message had not been communicated to BOP staff.

67.    Additionally, the working group recommended that the BOP develop an "early warning system" in order to detect signs that staff may be engaged in sexual conduct and to identify abusers with a history of abuse.

68.    This recommendation again suggests that the BOP was not analyzing the data it did have, allowing sexual predators to move from unit to unit without any systemic tracking or identification.

---

[27] *Id.*

[28] *Id.*

69. Had the working group's suggested changes, which flowed directly from the BOP's statutory and common law duties to the prisoners, been in place before 2021, Plaintiff Holland likely would have been saved from Defendant Feeney's violent sexual assault.

70. In October 2022, the DOJ Office of the Inspector General issued a Management Advisory Memorandum detailing its concerns over how the BOP had been handling administrative misconduct investigations and prisoner statements relevant to those investigations.[29]

71. The OIG specifically noted that "The BOP's reluctance to rely on evidence provided by inmates enhances the likelihood that employees who have engaged in misconduct avoid accountability for their actions and remain on staff, thereby posing serious insider threat potential, including the risk of serious harm to inmates."[30]

72. This policy of disregarding prisoner testimony was implemented by the Office of Internal Affairs.

73. The OIG further noted that the BOP's procedures had historically created a problem because "to the extent that the BOP's reluctance to rely on inmate testimony is known to its employees, this reluctance likely emboldens miscreant staff members in their interactions with inmates because such staff members may act without fear of disciplinary consequences."[31]

---

[29] Michael E. Horowitz, *Management Advisory Memorandum: Notification of Concerns Regarding the Federal Bureau of Prisons' (BOP) Treatment of Inmate Statements in Investigations of Alleged Misconduct by BOP Employees*, Oct. 2022, https://oig.justice.gov/sites/default/files/reports/23-001.pdf.

[30] *Id.*

[31] *Id.*

74. The report explained that the "OIG has serious concerns that the BOP is reluctant to rely on inmate testimony in administrative misconduct investigations, has a general practice of avoiding calling inmates as witnesses in MSPB and arbitration proceedings, and, at least in matters involving staff on inmate sexual assault, is effectively requiring significantly more proof than necessary under the applicable preponderance of the evidence standard to sustain misconduct and take disciplinary action against BOP employees."[32]

75. In sum: "The OIG concluded that this manner of handling misconduct by BOP employees is contrary to federal regulations and BOP policy and creates significant risks for the BOP."[33]

76. Over the last three years, more evidence of sexual abuse in the BOP has surfaced.

77. In 2022, a jury convicted a former prison warden at another federal facility afflicted by allegations of abuse, FCI Dublin, of sexually abusing three prisoners from 2019 through 2021 and of making false statements to a government agency in the investigation of criminal acts. Separate from the warden's own sexually abusive behavior, eight FCI Dublin correctional officers were charged with abusing prisoners during this warden's tenure.[34]

---

[32] *Id.*

[33] Michael E. Horowitz, *Management Advisory Memorandum: Notification of Concerns Regarding the Federal Bureau of Prisons' (BOP) Treatment of Inmate Statements in Investigations of Alleged Misconduct by BOP Employees*, Oct. 2022, https://oig.justice.gov/sites/default/files/reports/23-001.pdf.

[34] Press Release, Office of Public Affairs, U.S. Dept. of Justice, *Former Federal Prison Warden Sentenced for Sexual Abuse of Three Female Inmates,* Mar. 22, 2023, https://www.justice.gov/opa/pr/former-federal-prison-warden-sentenced-sexual-abuse-three-female-inmates.

78.    In 2022, the United States Senate Permanent Subcommittee on Investigations, Committee on Homeland Security and Governmental Affairs found that the BOP's Office of Internal Affairs had, at the time of publication, a backlog of 8,000 allegations of employee misconduct, some pending for over five years.[35]

79.    Beth Reese, Chief of the Office of Internal Affairs for the BOP, specifically reported to the Permanent Subcommittee on Investigations that neither her office nor the BOP as a whole systematically used the data it had to analyze and prevent sexual abuse of wards, even though the law requires it.[36] "[S]ave for an ad hoc review, BOP does not ascertain whether the number of sexual abuse allegations at a specific facility or region is trending or part of a larger pattern."[37]

80.    This failure of Ms. Reese to determine the larger pattern of sexual violence, especially at facilities like FMC Carswell where there is a culture of rampant sexual abuse, is a direct cause of Ms. Holland's sexual assault.

81.    Though the PREA standards require the BOP to "collect accurate, uniform data for every allegation of sexual abuse" and "review the data collected to identify problem areas and take corrective action on an ongoing basis," Ms. Reese admitted the BOP does not analyze complaint data to identify employees who are repeatedly alleged to abuse prisoners, facilities with an outlier number of complaints, or broader system-wise issues."[38]

---

[35] Staff Report, https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/2022-12-13%20PSI%20Staff%20Report%20-%20Sexual%20Abuse%20of%20Female%20Inmates%20in%20Federal%20Prisons.pdf at 4.

[36] *Id.* at 22-23.

[37] *Id*. at 23.

[38] *Id*. at pp. 22-23 (quotations cleaned up).

82. In 2024, the court in the Dublin class action found that "the Bureau of Prisons has proceeded sluggishly with intentional disregard of the inmates' constitutional rights despite being fully apprised of the situation for years."[39]

83. In deciding to appoint a Special Master, the Northern District of California determined that the BOP had knowledge of the sexual abuse at BOP facilities and that leadership of the BOP "has been, and is, deliberately indifferent to plaintiffs' risk of abuse."[40]

84. The Court made that determination because of the delays in action by the BOP Central Office, including Ms. Reese, who first received complaints of sexual abuse from FCI Dublin in 2019, yet did not start prosecuting these cases until 2021.[41]

85. In 2024, a Special Master Report unearthed a series of deficiencies at the California facility, some of which "are likely an indication of systemwide issues within the BOP, rather than simply within FCI Dublin."[42]

86. The report's findings detailed the failures of the central BOP office, including "the failure of Central Office and Regional Office management to correct significant and

---

[39] *Cal. Coal. for Women Prisoners v. United States*, 723 F. Supp. 3d 712, 719 (N.D. Cal. 2024) (cleaned up).

[40] *Id.* at 736

[41] *Id.*

[42] Wendy Still, *First Report of the Special Master Pursuant to the Court's Order of March 26, 2024*, June 5, 2024, https://static1.squarespace.com/static/64a5d4d138199b2c7c48c3de/t/66d361045918c670b861f4af/1725128967464/FCI+Dublin%2C+Special+Master+Report+%28No+Attachments%29.pdf.

longstanding deficiencies that had previously been idenfied [sic] in multiple audits and investigations."[43]

87. The Special Master also found that, "Furthermore, management's failure to ensure staff adhered to BOP policy put the health, safety and liberty of AICs [adults in custody] at great risk for many years."[44]

88. The Special Master found "numerous operational, policy, and constitutional violations" across the BOP, including the failure of the Central Office.[45]

89. The Special Master also reported that the BOP had "no standard protocol to report violations."[46]

90. The Special Master also noted that the BOP-wide data showed less than a 2% resolution rate for Administrative Remedies, which was "difficult to justify."[47]

91. The Special Master also found that the "BOP does not use PREA or other data to monitor reports of assault."[48]

92. Further, in a May 2025 report focusing on FMC Carswell, the Special Master found that at that specific facility, "staff, in general, have difficulty comprehending what constitutes a sexual abuse or PREA complaint."[49]

---

[43] *Id.*

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] *Id.* at 10.

[48] *Id.*

[49] Wendy Still, MAS, Senior Monitor California Coalition for Women Prisoners, et al., v. U.S. Federal Bureau of Prisons, et al., Consent Decree Case No. 4:23-cv-04155-YGR, 2nd Public Monthly Status Report May 1 - 31, 2025, 55, https://rbgg.com/wp-content/uploads/FCI-Dublin-

93.  Specific examples included five Dublin class members at Carswell who reported they had tried many times to file PREA complaints, and a woman who was observed by male and female officers while she underwent a vaginal hysterectomy. The original investigating officer found no action was warranted, even though policy dictates that it should have been referred to the Office of Internal Affairs.[50]

94.  The Report also found that, "Additionally, there appears to be a basic misunderstanding regarding the role of the PREA Compliance Manager and staff, at FMC Carswell, regarding the requirement that a sexual abuse complaint be logged, documented, and forwarded to the investigative level."[51]

95.  In another required report, the Special Master found that PREA Compliance Monitors ("PCMs") at each BOP facility, including specifically Carswell, "appear to lack the full scope of training and knowledge the Orientation Guide mentions. These deficiencies appear to contribute to the lack of a safe environment for Class Members at these facilities. Furthermore, PCMs assume this role on a rotation basis, with little training provided by BOP."[52]

96.  On September 29, 2025, the United States Government Accountability Office (GAO) released a report titled "Bureau of Prisons: Strategic Approach Needed to Prevent and

---

Case-4-23-cv-04155-YGR-May-2025-Monthly-Consent-Decree-Report-FINAL-July-29-2025.pdf.

[50] *Id*. at 56.

[51] *Id*.

[52] Wendy Still, MAS, Senior Monitor California Coalition for Women Prisoners, et al., v. U.S. Federal Bureau of Prisons, et al., Consent Decree Case No. 4:23-cv-04155-YGR, 1st Quarterly Status Report, March 31 – June 30, 2025, 22, https://rbgg.com/wp-content/uploads/FCI-Dublin-Case-4-23-cv-04155-YGR-1st-Quarterly-Report-March-31-June-30-2025-FINAL.pdf.

Address Employee Misconduct."[53] The GAO found that, between October 2013 and February 2025, the BOP Office of Internal Affairs opened 86,193 cases and complaints of employee misconduct.[54] While that number includes all employee misconduct allegations, the BOP investigated more sexual abuse allegations than any other category, except for the introduction of contraband.[55] Further, the fourth-most investigated category was inappropriate relationships, which "could involve [BOP] employees engaging in inappropriate sexual relationships with subordinates or showing partiality toward incarcerated individuals."[56]

97.   In short, the long history of the Defendants' mismanagement and total disregard of national policies created the conditions that led directly to Plaintiff Holland being raped and sexually abused by Defendant Feeney, a BOP staff member who had a history of sexually violating prisoners under his care.

98.   This mismanagement existed in the face of binding regulations, refuting any staff discretionary function or duty, requiring the contrary.

99.   Binding PREA regulations, which apply across the BOP, mandate staff reporting, where all BOP staff are required to "report immediately . . . **any knowledge, suspicion, or information** regarding an incident of sexual abuse or sexual harassment that occurred in a facility. . .; retaliation against inmates or staff who reported such an incident; and any

---

[53] Report, https://www.gao.gov/assets/gao-25-107339.pdf.

[54] *Id.*, p. 28.

[55] *Id.*, p. 43.

[56] *Id.*

staff neglect or violation of responsibilities that may have contributed to an incident or retaliation." 28 C.F.R. § 115.61(a) (emphasis added).

100. Similarly, BOP Program Statement 3420.11 requires any employee to "report to their CEO (or other appropriate authority such as the [OIA] or [OIG]) any violation, appearance of a violation, or attempted violation of these standards or of any law, rule, or regulation."

101. According to the PREA Resource Center, because of the requirement to report suspicion of sexual abuse, rumors of sexual abuse amongst prisoners and staff should trigger the same mandate as above, requiring immediate reporting to the supervisory authority and investigation of the alleged perpetrator.

102. When an incarcerated person is subject to a substantial risk of imminent sexual abuse, the BOP shall take immediate action to protect that person. *See Id.* § 115.62.

103. In addition, administrative investigations of alleged sexual abuse by a staff member are required to proceed "promptly, thoroughly, and objectively for all allegations, including third-party and anonymous reports." *Id.* § 115.71(a).

104. Similarly, BOP Program Statement 5324.12 requires that "[a]llegations of sexually abusive behavior receive prompt intervention upon report."

105. The presumptive disciplinary sanction for substantiated allegations of sexual abuse is termination. *See id.* § 115.76(b).

106. Victims shall also be offered medical and mental health care by the BOP. *See id.* § 115.83.

107. Defendants had countless opportunities to follow those mandates and stop Defendant Feeney's misconduct. Defendant Feeney's actions, including, but not limited to, engaging

in a violent sexual abuse of Plaintiff, as well as the openness with which he flirted with, and had inappropriate relations with other prisoners, and his prior, unaddressed misconduct with other prisoners, as well as the frequency in which he brought in illegal drugs and other contraband, was obvious, and suspicious for sexual misconduct.

108. Even so, Defendants took no actions to investigate or stop this suspicious and recurrent behavior.

109. Defendants failed to investigate, discipline, supervise, monitor, question, or stop Defendant Feeney, despite numerous indications of sexual misconduct.

110. Instead, Defendant Feeney was moved from a housing unit, with actual knowledge by Defendant Carr and/or Defendant Smith, where he had been accused of inappropriate behavior with women in his custody, to Plaintiff Holland's housing unit.

111. Staff at FMC Carswell were also terminated for reporting sexual abuse and harassment, and staff in 2022 knew that they needed to stay quiet to keep their job.

112. The failures to follow binding policies cannot be explained without deliberate indifference, recklessness, and carelessness of the Defendant United States, the individual defendants, and BOP's other agents, servants, contractors, and employees towards the risk of sexual abuse that incarcerated women face, and is the direct and proximate cause for Plaintiff's damages.

**BOP DEFENDANTS ALLOWED DEFENDANT FEENEY TO VIOLENTLY SEXUALLY ASSAULT MS. HOLLAND**

113. In 2021, Ms. Holland entered the BOP and was held at FMC Carswell.

114. She was placed at FMC Carswell for medical reasons.

115. Prior to her self-surrendering in 2021, Ms. Holland suffered stroke-like symptoms following an accident at home and experienced partial paralysis on her right side.

116. As such, Ms. Holland was housed on Floor 4, or "Med Surge," one of the medical floors at FMC Carswell.

117. Despite her frequent requests, Ms. Holland received no physical therapy until August 2022, following a subsequent neurological incident.

118. As a result, Ms. Holland required assistance from others to move around.

119. She required a wheelchair until May 2023.

120. During this time, she required assistance to get around and she needed help in moving her wheelchair, getting in and out of her wheelchair, opening food, buttoning her pants, and even brushing her hair.

121. Ms. Holland was wholly dependent on other people.

122. In February 2022, Defendant Feeney began working in Ms. Holland's unit.

123. He worked the 4pm-midnight shift until the quarter changed in October 2022.

124. Defendant Feeney was friendly and would talk with Ms. Holland about her family, football, and church.

125. Ms. Holland ran a Bible study group.

126. Defendant Feeney would join their Bible study.

127. At first, Ms. Holland believed that Defendant Feeney was a nice guy who wanted to treat the prisoners with kindness.

128. Things started to change in April 2022 when, one day, Defendant Feeney entered Ms. Holland's room and showed her roommate a bottle of pills.

129. Ms. Holland knew that her roommate was selling drugs and, to her, Defendant Feeney's actions indicated that Defendant Feeney was supplying them to her roommate.

130. Ms. Holland does not know how Defendant Feeney was able to get these illegal drugs into the facility.

131. While officers are allowed to bring outside food into the facility, there is a zero-tolerance policy for bringing in illegal drugs.

132. Had staff, including Defendant Carr, exercised reasonable care, they would have noticed Defendant Feeney bringing in illegal drugs.

133. After this point, Ms. Holland started seeing Defendant Feeney get friendlier with the other prisoners.

134. He would come into women's rooms and sit on their bed, talking for hours; he would bring outside food and other contraband in; he would show the women images on the computers; and he would talk with Ms. Holland about women he was with sexually on the outside.

135. While some of this conduct is not explicitly violative of policy, the overly friendly behavior with prisoners should have alerted reasonable staff members that Defendant Feeney's conduct was outside of BOP policy and should have triggered a PREA investigation.

136. Ms. Holland started to feel like something was off, and that Defendant Feeney was interested in something in return for his kindness.

137. In July 2022, Ms. Holland suffered another neurological issue, and her right hand entirely contracted in.

138. Following her trip to medical, when she was in the room by herself waiting for a nurse, Defendant Feeney entered the room, shut the door, and sat next to Ms. Holland, holding her hand.

139. Nothing sexual happened, but Ms. Holland felt incredibly uncomfortable.

140. This discomfort was compounded by the rumors Ms. Holland had heard about disciplinary troubles Defendant Feeney had at FMC Carswell, including bringing in contraband for prisoners and having inappropriate, sexual relationships with prisoners.

141. In addition, Defendant Feeney had once confided in Ms. Holland that he had been written up for disciplinaries, but that it was because he was being targeted for being too nice.

142. Ms. Holland also knew that he remained working and was not let go or otherwise terminated from his position as an officer.

143. Despite the information that Defendant Feeney was suspected of having inappropriate relationships with prisoners in his custody, Defendants let him keep working in close contact with prisoners.

144. Allowing this continued access to prisoners was contrary to written policy and sound corrections practice.

145. On information and belief, Defendant Feeney was moved to Ms. Holland's floor, from the COVID unit, before the quarter's end in February because he had been caught bringing in drugs and having inappropriate sexual relations with prisoners.

146. According to BOP Standards of Employee Conduct, the BOP has a zero-tolerance policy for illegal drug use and those drugs being brought into a BOP facility, and employees may face federal criminal prosecution for doing so. BOP Standards of Employee Conduct, 3420.12.

147. Despite violating policy by bringing in drugs and having sexual relations with prisoners in his custody, and, contrary to policy and sound corrections practice, Defendants decided not to suspend Defendant Feeney or conduct a more thorough investigation.

148. Instead, they merely moved him to a different floor, the floor in which Ms. Holland was housed.

149. He therefore remained on the compound and continued to have unfettered access to FMC Carswell prisoners.

150. In September 2022, Ms. Holland was getting ready to shower.

151. The shower was located in the bathroom inside her cell.

152. Because she could not move the right side of her body, showering required her to be sitting in a shower chair, and she needed assistance getting pushed into the shower.

153. Ms. Holland's roommate assisted Ms. Holland by pushing her wheelchair into the shower and assisted her getting into the shower chair before leaving the bathroom.

154. As Ms. Holland began showering, with the shower head in front of her, she heard the door to the bathroom opening, assuming that it was her roommate.

155. But the shower curtain opened, and Defendant Feeney was standing there.

156. Defendant Feeney then grabbed Ms. Holland by her left arm, pulling her up, and letting her right side hang off him.

157. She heard Defendant Feeney unzipping his pants while he told her to keep her mouth shut.

158. He then began to sodomize Ms. Holland while she screamed and cried for help.

159. Ms. Holland is not sure how long the assault lasted.

160. When Defendant Feeney heard a noise, he got nervous, dropped Ms. Holland in the shower, and left.

161. Ms. Holland laid on the floor in the shower, with bloody knuckles, crying hysterically.

162. She was able to hook her left foot onto the wheelchair and army crawl to the wheelchair, where she pulled herself up and went to her room.

163. As she was getting ready to go to the prayer group, another prisoner stopped her outside the cell and told her she heard yelling.

164. Ms. Holland asked this prisoner not to tell anyone because she feared retaliation.

165. Ms. Holland was distraught, but thought that no one would believe her.

166. She kept this rape a secret until April 20, 2023.

167. After the violent rape, Ms. Holland did not see Defendant Feeney until he worked an overtime shift on her floor on April 19, 2023.

168. When she saw Defendant Feeney again, she was triggered and the trauma of the rape came rushing back.

169. She called her husband at the time and was unable to keep the rape a secret any longer.

170. Her husband then called the prison to report the rape.

171. When Ms. Holland came forward, she was sent to the nurses' station for a rape kit.

172. While there, the nurse on duty told her that she had previously reported Defendant Feeney, sometime before he had raped Ms. Holland, to BOP officials for sexually harassing other prisoners, but that nothing had been done.

173. This nurse also said that she had witnessed a prisoner sitting on Defendant Feeney's desk alone in his room and reported that to BOP officials.

174. Had Defendants appropriately responded to reports by this nurse that Defendant Feeney had inappropriate interactions with women under his custody, as is and was required pursuant to PREA regulations, it is likely that Ms. Holland would not have been raped by Defendant Feeney.

175. After Ms. Holland was taken to the nurses' station, she spoke with Lieutenant Frontera at FMC Carswell who conducted the initial interview.

176. At this time, a counselor told Ms. Holland that Defendant Feeney was not going to be coming back to work at FMC Carswell.

177. The following week, an investigator with OIG came for a meeting to investigate the sexual assault.

178. The OIG Investigator told Ms. Holland that Defendant Feeney had also been disciplined for bringing in drugs.

179. After Ms. Holland's meeting, OIG started calling other prisoners down to talk about Defendant Feeney.

180. On information and belief, during these interviews, OIG told some prisoners that Ms. Holland had told her that Defendant Feeney was bringing in drugs.

181. As a result, Ms. Holland was threatened by prisoners, and she requested protective custody the day after OIG began interviewing others because she feared for her life.

182. She requested protective custody again in November 2023, after she was moved to another unit with many women Defendant Feeney had been supplying with drugs.

183. Upon information and belief, Ms. Holland was intentionally placed in these units as retaliation, because staff knew that other prisoners blamed Ms. Holland for the decrease in drugs entering the facility.

184. In August 2023, Ms. Holland finally received therapy by Anita McNew at the Women's Rape Crisis Center.

185. She received only six sessions.

186. The sessions were also not confidential because they were conducted in a room with two-way mirror where the staff lounge was on the other side of the mirror.

187. According to Ms. McNew, Ms. Holland presented with symptoms consistent with reported sexual trauma including anxiety, avoidance, concentration difficulties, crying, depression, difficulty not thinking about the trauma, difficulty trusting, eating problems, fatigue, fear, feeling emotionally numb, flashbacks, headaches, helplessness, intrusive thoughts, loss of self-confidence, nightmares, shame, sleep difficulties, and stress. She was also diagnosed with PTSD.

188. Although Ms. Holland was moved to a new prison, BOP staff knew that she had reported the abuse, and she continued to face retaliation.

189. Ms. Holland had enough sentencing credits to have been eligible to be sent to a halfway house on September 24, 2024.

190. Even so, her halfway house application was not submitted until January 20, 2025.

191. Then, after she was given a halfway house date of March 3, 2025, someone pushed her date back to this summer.

192. Ms. Holland was finally released from BOP custody in October 2025, and remains on supervised release.

193. Defendants' acts caused Plaintiff severe mental, physical, and emotional harm including PTSD, night terrors, depression, and chronic anxiety.

**EXHAUSTION OF FTCA PROCESS**

194. On February 28, 2024, Ms. Holland's administrative claim under the Federal Tort Claims Act was processed by the BOP's South Central Regional Office.

195. The BOP acknowledged receipt but has not substantively responded.

196. Ms. Holland filed her administrative claim pro se while incarcerated at FMC Carswell.

197. In her claim, Ms. Holland stated that she was sodomized in September 2022 when she had no use of the right side of her body. She noted that she "cooperated with OIG and gave facts to other illegal things being done." She noted that the BOP was "[b]reaking every single PREA policy there is." She also noted that BOP continued to keep her at FMC Carswell despite her participation in the OIG investigation and the threats and retaliation she was experiencing.

**CAUSES OF ACTION**

**COUNT I – NEGLIGENCE UNDER FEDERAL TORT CLAIMS ACT, TEXAS COMMON LAW**
**(AGAINST DEFENDANT UNITED STATES OF AMERICA)**

198. Plaintiff repeats and incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth above.

199. At all relevant times, Defendant United States of America acted negligently in its indifference to Plaintiff's safety.

200. At all relevant times, Defendant United States of America hired correctional and administrative employees at FMC Carswell, including Defendant Feeney, as well as

colleagues and supervisors of Defendant Feeney whose identities are currently unknown to Plaintiff.

201. At all relevant times, Defendant United States of America's employees were acting within the scope of their employment, in their official uniforms during work hours, as federal employees of Defendant.

202. At all relevant times, FMC Carswell personnel held themselves out to incarcerated individuals as personnel with the ability and knowledge to carry out their duties, provide due care, and act in accordance with standards of reasonable care.

203. At all relevant times and within the scope of their employment by Defendant United States of America, the above-named and unknown staff, while working within their official capacities at FMC Carswell, owed a duty to Plaintiff while she was at FMC Carswell.

204. In addition to a custodial duty owed to Plaintiff, Defendant United States of America was statutorily obligated under the Prison Rape Elimination Act and BOP policy to protect prisoners from foreseeable harm that included the sexual abuse suffered by Ms. Holland.

205. Defendant United States of America should have known that Defendant Feeney had a propensity to sexually abuse inmates, due to his past disciplinaries received at FMC Carswell.

206. Defendant United States of America should have known that Defendant Feeney acted inappropriately with prisoners under his care at FMC Carswell.

207. Defendant United States of America was on notice of the possibility that prisoners would be sexually abused by corrections officers and other facility staff, through the above-mentioned investigations, articles, lawsuits, and reports.

30

208. As such, there was a foreseeable risk that correctional officers would sexually abuse Plaintiff and others under their control.

209. Defendant did not exercise reasonable care in preventing Plaintiff and other prisoners from the foreseeable risk of sexual abuse.

210. Defendant United States of America failed to create and implement procedures, training, and supervision that would protect prisoners from the foreseeable risk of harm, including sexual abuse.

211. Defendant United States of America failed to adequately monitor and supervise employees, such as Defendant Feeney, while employees were acting within the scope of their employment.

212. Defendant United States of America disciplined and terminated employees who reported sexual assault and retaliated against prisoners who did the same, in violation of binding mandates, thus discouraging other individuals from coming forward with additional information.

213. Defendant United States of America knew or should have known of the risk posed to Plaintiff and other prisoners that they would be sexually assaulted by employees such as Defendant Feeney.

214. Defendant United States of America failed to maintain its facilities in a manner to deter the possibility of sexual abuse.

215. Due to Defendant United States of America's herein described acts and omissions, it breached its duty to protect Plaintiff and other prisoners from the reasonably foreseeable harm of sexual abuse by its employees.

216. Defendant United States of America's above-described acts and omissions were a direct and proximate cause of Plaintiff's injuries and damages herein.

## COUNT II – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM UNDER FEDERAL TORT CLAIMS ACT, TEXAS COMMON LAW (AGAINST DEFENDANT UNITED STATES OF AMERICA)

217. Plaintiff repeats and incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth above.

218. Defendant United States of America's acts and omissions herein constituted extreme and outrageous conduct, which caused Ms. Holland's severe emotional distress following her sexual abuse.

219. Defendant United States of America intended to cause, or was recklessly indifferent to the probability of causing, Plaintiff severe emotional distress.

220. Defendant Feeney engaged in extreme and outrageous conduct through violently raping Ms. Holland while she was incarcerated. He intended to cause her severe emotional distress, or was recklessly indifferent to the probability of causing such distress, when he sexually abused her while he was supposed to be providing medical care.

221. At all relevant times, Defendant Feeney was acting within the scope of his employment at FMC Carswell, and used his authority as a member of the facility's medical staff to sexually assault Plaintiff, while Plaintiff did not have the ability to consent or withhold consent.

222. Defendant United States of America is liable for the intentional torts committed by Defendant Feeney and his abuse of his position of authority as a correctional officer within the scope of his employment.

223. Defendant United States of America's acts and omissions were a direct and proximate cause of Plaintiff's serious physical and emotional harm.

## COUNT III– INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM UNDER TEXAS COMMON LAW
### (AGAINST DEFENDANT FEENEY)

224. Plaintiff repeats and incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth above.

225. Defendant Feeney's acts and omissions herein constituted extreme and outrageous conduct, which caused Ms. Holland's severe emotional distress following her sexual abuse.

226. Defendant Feeney intended to cause, or was recklessly indifferent to the probability of causing, Plaintiff severe emotional distress.

227. Defendant Feeney engaged in extreme and outrageous conduct through violently raping Ms. Holland while she was incarcerated. He intended to cause her severe emotional distress, or was recklessly indifferent to the probability of causing such distress, when he sexually abused her while he was supposed to be providing medical care.

228. At all relevant times, Defendant Feeney was acting within the scope of his employment at FMC Carswell, and used his authority as a member of the facility's medical staff to sexually assault Plaintiff, while Plaintiff did not have the ability to consent or withhold consent.

229. Defendant Feeney's acts and omissions were a direct and proximate cause of Plaintiff's serious physical and emotional harm.

### COUNT IV – SEXUAL ASSAULT UNDER FEDERAL TORT CLAIMS ACT, TEXAS COMMON LAW
### (AGAINST DEFENDANT UNITED STATES OF AMERICA)

230. Plaintiff repeats and incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth above.

231. Plaintiff brings this Claim under the FTCA for sexual assault against Defendant United States of America, based on the conduct of its officer, Defendant Feeney.

232. Defendant Feeney intentionally and knowingly penetrated Ms. Holland's anus without her consent.

233. Defendant Feeney's intentional torts, such as this sexual assault, caused Ms. Holland's physical and emotional injuries, and Defendant United States of America is liable for intentional torts perpetrated by its agents within the scope of their employment.

234. It was impossible for Ms. Holland to provide consent under 18 U.S.C. § 2243(b), which constitutes a felony when a BOP employee knowingly engages "in a sexual act with another person who is 1) in official detention; and 2) under the custodial, supervisory, or disciplinary authority of the person so engaging."

235. Defendant Feeney acted within the scope of his authority and employment as a federal employee in the medical unit at FMC Carswell.

236. Ms. Holland reasonably believed that Defendant Feeney was in a position of control or authority, and that she did not have the ability to consent or not consent to sexual acts that he initiated.

237. The above-described acts and omissions were a direct and proximate cause of Plaintiff's serious physical and emotional harm.

238. Defendant United States of America is liable for the intentional torts committed by Defendant Feeney and his abuse of his position of authority as a correctional officer within the scope of his employment.

## COUNT V – SEXUAL ASSAULT UNDER TEXAS COMMON LAW
## (AGAINST DEFENDANT FEENEY)

239. Plaintiff repeats and incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth above.

240. Defendant Feeney committed sexual assault on Ms. Holland.

241. Defendant Feeney intentionally and knowingly penetrated Ms. Holland's anus without her consent.

242. Further, it was impossible for Ms. Holland to provide consent under 18 U.S.C. § 2243(b), which constitutes a felony when a BOP employee knowingly engages "in a sexual act with another person who is 1) in official detention; and 2) under the custodial, supervisory, or disciplinary authority of the person so engaging."

243. Defendant Feeney acted within the scope of his authority and employment as a federal employee in the medical unit at FMC Carswell.

244. Ms. Holland reasonably believed that Defendant Feeney was in a position of control or authority, and she did not have the ability to consent or not consent to sexual acts that he initiated.

245. With the intent to cause harmful or offensive contact, Defendant Feeney subjected Ms. Holland to sexual acts to which she could not consent. These acts were deeply offensive and provocative to her personal dignity and would offend a person of ordinary sensitivity.

246. These above-described acts and omissions were a direct and proximate cause of Plaintiff's serious physical and emotional harm.

## COUNT VI – NEGLIGENT SUPERVISION UNDER FEDERAL TORT CLAIMS ACT
## (AGAINST DEFENDANT UNITED STATES OF AMERICA)

247. Plaintiff repeats and incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth above.

248. Defendant United States of America hired Defendant Feeney and other abusive employees, and allowed them to use their positions of power within the facility to exert influence over prisoners such as Ms. Holland.

249. Defendant United States of America knew that potential abusers such as Defendant Feeney would have the opportunity to be alone with female prisoners, particularly in secluded areas and areas without other facility personnel or video surveillance.

250. Defendant United States of America failed to properly oversee and administer FMC Carswell, and failed to properly implement BOP and PREA policies that would have deterred sexual abuse, such as that suffered by Ms. Holland.

251. Defendant United States of America had knowledge of the threat of future sexual abuse posed to prisoners as committed by facility staff, through the above-mentioned reports and lawsuits.

252. Defendant United States of America's knowledge of prior sexual abuse at FMC Carswell placed it on notice of employees' propensity to engage in sexually abusive behavior with prisoners such as Ms. Holland.

253. If Defendant United States of America had properly supervised employees, facility staff such as Defendant Feeney would not have been able to sexually abuse prisoners.

254. If Defendant United States of America had conducted thorough investigations of reported employees, Defendant Feeney would not have been able to continue sexually abusing prisoners, including Ms. Holland.

255. Defendant United States of America was also negligent in allowing employees who it knew had previously committed sexual abuse to continue to safeguard and monitor a female population of prisoners.

256. If Defendant United States of America had properly supervised and investigated employees such as Defendant Feeney and his supervisors, it would have learned of his propensity to commit sexual abuse.

257. Defendant United States of America's above-described acts and omissions were a direct and proximate cause of Plaintiff's serious physical and emotional harm.

**COUNT VII – NEGLIGENT SUPERVISION UNDER TEXAS LAW**
**(AGAINST DEFENDANTS CARR AND SMITH)**

258. Plaintiff repeats and incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth above.

259. Defendants Carr and Smith hired, supervised, and retained Defendant Feeney and allowed him to use his position of power as a BOP employee within the facility to exert influence over prisoners such as Ms. Holland.

260. Defendants Carr and Smith knew, or should have known had they exercised reasonable care, that Defendant Feeney was an unfit BOP employee prior to Plaintiff Holland's sexual assault.

261. There was sufficient proof that Defendant Feeney had inappropriate relationships with other prisoners and was bringing in illegal drugs, acts which should have resulted in

37

Defendants Carr and Smith investigating Defendant Feeney, and then in Defendants Carr or Smith terminating Defendant Feeney.

262. Even if Defendants Carr and Smith, as the wardens of FMC Carswell, did not have actual knowledge that Defendant Feeney had brought in illegal drugs and had inappropriate relations with other prisoners, it would have been obvious had Defendants Carr and Smith exercised reasonable care and reasonably performed their job duties.

263. Yet, Defendants Carr and Smith continued to employ Defendant Feeney.

264. By continuing to employ Defendant Feeney, Defendants Carr and Smith put Plaintiff, and all other prisoners at FMC Carswell, at an unreasonable risk of harm.

265. If Defendants Carr and Smith had conducted thorough investigations of reported employees, Defendant Feeney would not have been able to continue sexually abusing prisoners, including Ms. Holland.

266. Defendants Carr and Smith's above-described acts and omissions were a direct and proximate cause of Plaintiff's serious physical and emotional harm.

**PRAYER FOR RELIEF**

Ms. Holland prays for judgment against Defendants, and each of them, as follows:

267. An award of compensatory, punitive, and nominal damages to Plaintiff in an amount to be determined at trial;

268.  An award to Plaintiff of the costs of this suit and reasonable attorneys' fees and litigation expenses; and

269. For such other and further relief as this Court may deem just and proper.

Respectfully submitted by,

/s/ Deborah M. Golden
Deborah M. Golden
DC Bar # 470-578

bex kolins DC Bar # 90035779
bkolins@debgoldenlaw.com

The Law Office of Deborah M. Golden
700 Pennsylvania Ave. SE, 2nd Floor
Washington, DC 20003
202-630-0332
dgolden@debgoldenlaw.com

/s/ Sara Zampierin
Sara Zampierin
State Bar No. 24132896
TEXAS A&M UNIVERSITY CIVIL
RIGHTS CLINIC*
1515 Commerce St.
Fort Worth, TX 76102
T: 817-212-4123
E: sara.zampierin@law.tamu.edu

* Plaintiff is represented by a clinic operated
by Texas A&M University School of Law,
but this document does not purport to
present the school's institutional views, if
any.

*Attorneys for Plaintiff Justina Holland*